FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

2020 APR -8  AM 9: 52

CLERK, US DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | FILED UNDER SEAL PURSUANT |
| *ex rel.* ANEKO JACKSON, | § | TO 31 U.S.C § 3729, et seq. |
| | § | |
| Relator, | § | |
| | § | No. **1:20CV0368 LY** |
| v. | § | |
| | § | |
| CIMA HEALTHCARE MANAGEMENT, | § | |
| INC. d/b/a ELARA CARING, CIMA | § | |
| HOSPICE OF CENTRAL TEXAS, L. P. | § | |
| d/b/a ELARA CARING, and HEALTH | § | |
| SENSE HOSPICE, INC. d/b/a ELARA | § | |
| CARING, | § | |
| | § | |
| Defendants. | § | JURY TRIAL DEMANDED |

## RELATOR'S ORIGINAL COMPLAINT

Relator Aneko Jackson, on behalf of the United States of America, pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729-3733, files this Complaint against Defendants CIMA Healthcare Management, Inc. d/b/a Elara Caring, CIMA Hospice of Central Texas, L.P. d/b/a Elara Caring, and Health Sense Hospice, Inc., d/b/a Elara Caring. This Complaint is premised on Defendants' scheme to defraud the United States government by (1) knowingly submitting claims to the Medicare program for hospice services without obtaining statutorily required signed election statements and notices of patient's rights, and (2) knowingly submitting claims for hospice care to the Medicare program on behalf of beneficiaries who did not satisfy the admission criteria for hospice admission. In support thereof, Relator alleges as follows:

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, 31 U.S.C. § 3729, *et seq.*, and 31 U.S.C. § 3730(b).

2.      Venue is proper in the Western District of Texas pursuant to 28 U.S.C. §1391(b) and (c) and 31 U.S.C. § 3732(a).

3.      This case is based on the knowledge of Relator Aneko Jackson, an "original source" as those terms are defined in 31 U.S.C. § 3730.

4.      This Complaint has been filed under seal and shall remain under seal for at least sixty (60) days and until the Court so orders.

5.      A copy of this Complaint has been served on the United States Attorney General and the United States Attorney for the Western District of Texas.

6.      All conditions precedent required by 31 U.S.C. § 3730 have occurred.

## PARTIES

7.      Plaintiff, the United States of America, acting through the Department of Health and Human Services ("HHS") and the Centers for Medicare and Medicaid Services ("CMS"), administers the Health Insurance Program for the Aged and Disabled ("Medicare"), established by Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*

8.      Relator Aneko Jackson ("Relator") is a resident of the State of Texas and is a former employee of Defendant CIMA Hospice of Central Texas, L.P. d/b/a Elara Caring.

9.      Defendant CIMA Healthcare Management, Inc. is a Texas corporation doing business under the name Elara Caring.  CIMA Healthcare Management, Inc. is the General Partner of CIMA Hospice of Central Texas, L.P. d/b/a Elara Caring.  Its principal place of business is located at 14295 Midway Road, Suite 400, Addison, Texas, 75001.  CIMA

Healthcare Management, Inc. may be served with process via its registered agent for service, National Registered Agents, Inc., located at 1999 Bryan St., Suite 900, Dallas, Texas 75201.

10.     Defendant CIMA Hospice of Central Texas, L.P. is a Texas limited partnership also doing business under the name Elara Caring. Its principal place of business is located at 14295 Midway Road, Suite 400, Addison, Texas, 75001. CIMA Hospice of Central Texas, L.P. d/b/a Elara Caring may be served with process via its registered agent for service, National Registered Agents, Inc., located at 1999 Bryan St., Suite 900, Dallas, Texas 75201.

11.     Health Sense Hospice, Inc. is a Texas corporation also doing business under the name Elara Caring. Its principal place of business is located at 14295 Midway Road, Suite 400, Addison, Texas, 75001. Health Sense Hospice, Inc. may be served with process via its registered agent for service, National Registered Agents, Inc., located at 1999 Bryan St., Suite 900, Dallas, Texas 75201.

12.     Upon information and belief, Defendant CIMA Healthcare Management, Inc. is a parent company of several subsidiary entities, including Defendants CIMA Hospice of Central Texas, L.P., and Health Sense Hospice, Inc. Defendant CIMA Healthcare Management, Inc. assumes responsibility for overseeing and managing its subsidiaries, which operate individual hospices located in various regions of Texas. Defendants CIMA Hospice of Central Texas, L.P., and Health Sense Hospice, Inc. are the subsidiaries that operate the hospices servicing the Austin and New Braunfels, Texas areas.

## THE FALSE CLAIMS ACT

13.     Generally, the False Claims Act ("FCA") prohibits any person from (1) knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval to the Government; (2) knowingly making, using, or causing to be made or used, a false

record or statement material to a false or fraudulent claim; (3) conspiring to commit a violation

of the False Claims Act; and (4) knowingly making, using, or causing to be made or used, a false

record or statement material to an obligation to pay money to the Government, or knowingly

concealing or improperly avoiding an obligation to pay money to the Government.  31 U.S.C. §

3729.

14.    The FCA defines "knowing" and "knowingly" to mean, "that a person, with

respect to information—(i) has actual knowledge of the information; (ii) acts in deliberate

ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth

or falsity of the information." 31 U.S.C. § 3729(b)(1).

## THE MEDICARE PROGRAM

15.    Congress established the Medicare program as part of the Social Security

Amendments of 1965. The Medicare program is a national health insurance plan which covers

the cost of medical care for the elderly and disabled. 42 U.S.C. § 1395 *et seq*. The Medicare

program provides basic protection against the costs of inpatient hospital and other institutional

provider care. It also covers the cost of physician and other healthcare practitioner services.

16.    Medicare Part A covers hospital inpatient hospitalization costs. 42 U.S.C. §§

1395c-1395i-2.  Hospice care is covered under Part A and includes nursing care, medical social

services, medical supplies (including drugs and biologicals), and physician services, among other

things. 42 U.S.C. § 1395x(dd).

## THE MEDICARE HOSPICE BENEFIT

17.    The Medicare hospice benefit was first authorized in 1982.  The goals of hospice

care are to help terminally ill beneficiaries continue life as comfortably as possible and to

support their families and other caregivers.[1] In 2016, Medicare payments to hospice providers totaled $16.8 billion.[2]

18.     To be eligible for hospice care, beneficiaries must be entitled to Part A of Medicare and be certified as having a terminal illness. 42 U.S.C. §§ 1395f(a)(7)(A) and 1395x(dd)(3)(A). A certification of terminal illness must: (1) state that the individual's medical prognosis is that his or her life expectancy is six months or less if the terminal illness runs its normal course; (2) include specific clinical findings and other documentation which support a life expectancy of six months or less; (3) be signed by a physician; and (4) include a physician's narrative explanation of the clinical findings which support the individual's life expectancy of six months or less. 42 C.F.R. § 418.22.

19.     In order to receive the Medicare hospice benefit, a beneficiary must give informed consent of his or her election of hospice care. 42 U.S.C. §§ 1395d(d)(2)(A). The beneficiary does so by signing an election statement prepared by the hospice. 42 CFR § 418.24(a). The election statement is intended to ensure that the beneficiary understands and consents to the hospice benefit by specifying that hospice care is palliative, not curative, and that the beneficiary waives the right to Medicare payment for treatment of the terminal illness except for services provided by the hospice. 42 CFR § 418.24(b). Generally, the election statement must acknowledge that the patient has been given a full understanding of hospice care and comprehends that certain Medicare services are waived by the election. *See id.*

20.     Specifically, the election statement must: (1) identify the hospice that will provide care to the individual; (2) contain the acknowledgment of the individual that he or she has been

---

[1] *Safeguards for Medicare Patients in Hospice Care*, ICN MLN2078643, February 2020, CENTER FOR MEDICARE AND MEDICAID SERVICES, p.1, *available at* https://www.cms.gov/files/document/hospice-fact-sheet-mln2078643.pdf (last visited Mar. 16, 2020).
[2] *Hospice Services Payment System*, MEDPAC, Rev. October 2018, p.1, *available at* http://medpac.gov/docs/default-source/payment-basics/medpac_payment_basics_18_hospice_final_sec.pdf?sfvrsn=0 (last visted Mar. 16, 2020).

given a full understanding of hospice care; (3) contain the acknowledgment that the individual understands that certain Medicare services are waived by the election; (4) contain the effective date of the election; (5) identify the individual's designated attending physician; (6) contain the acknowledgment that the designated attending physician was the individual's choice; and (7) contain the signature of the individual. *See id.* An individual cannot designate an effective date of care retroactively. 42 CFR § 418.24(b)(4).

21.     As a condition of participation under Medicare, hospice providers must also inform of patients of their rights and protect and promote the exercise of these rights. 42 CFR § 418.52. "During the initial assessment visit in advance of furnishing care, the hospice must provide the patient or representative with verbal (meaning spoken) and written notice of the patient's rights and responsibilities in a language and manner that the patient understands." *Id.* "The hospice must obtain the patient's or representative's signature, confirming that he or she has received a copy of the notice of rights and responsibilities." *Id.*

22.     Upon a beneficiary's election of hospice care, the hospice agency is responsible for medical care related to the beneficiary's terminal illness and related conditions. Beneficiaries who elect hospice care are entitled to receive care for two 90-day periods, followed by an unlimited number of 60-day periods. 42 U.S.C. § 1395d(a)(4). A hospice provider must obtain written certification of terminal illness for each election period. 42 C.F.R. § 418.22(a)(1). For the initial hospice certification, the hospice must obtain the certification of terminal illness from the medical director of the hospice or a physician member of the interdisciplinary group. 42 C.F.R. § 418.22(c)(1-2). No one other than a medical doctor or doctor of osteopathy can certify or re-certify an individual as terminally ill. Medicare Benefit Policy Manual, Chapter 9, Coverage of Hospice Services Under Hospital Insurance, § 20.1.

23.     The Medicare hospice benefit includes four (4) levels of care: routine home care, continuous home care, inpatient respite care, and general inpatient care. *Id.* at § 40.  Hospices are paid a per diem rate through Part A for each day of care provided during the election period, regardless of the quantity of services provided. *Id.*  Medicare reimburses providers for hospice care that is reasonable and necessary for the palliation or management of terminal illness. 42 U.S.C. § 1395y(a)(1)(C).

24.     Providers submit claims to Medicare by billing a private carrier, known as a Medicare Administrative Contractor ("MAC"), which reviews, approves, and pays Medicare claims to health care providers on behalf of CMS.  Providers who submit claims electronically to CMS or to CMS contractors, including MACs, must certify in their enrollment application that, among other things, they "will submit claims that are accurate, complete, and truthful," and must acknowledge that "all claims will be paid from Federal funds, that the submission of such claims is a claim for payment under the Medicare program, and that anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim is required pursuant to this agreement may, upon conviction, be subject to a fine and/or imprisonment under applicable Federal law." *See* Medicare Claims Processing Manual, § 30.2.A.

## FACTS

25.     Defendants are part of the Texas-based "Elara Caring" brand, "the new home health giant formed as a result of a three-way merger between Great Lakes Caring, Jordan Health Services, and National Home Health Care in 2018."[3]  Elara Caring has 35,000 team members and 225 offices in sixteen (16) different states and, as of March 2019, had an average daily

---

[3] Robert Holly, *Elara Caring CEO: There's No Curbing Investor Appetite for Home Care*, March 14, 2019, *available at* https://homehealthcarenews.com/2019/03/elara-caring-ceo-theres-no-curbing-investor-appetite-for-home-care/ (last visited Mar. 16, 2020).

census of approximately 65,000 patients.[4]  In the interest of simplicity, Defendants' operations shall be collectively referred to as "Elara."

26.     Relator has worked as a nurse since 2000 when she became a Licensed Vocational Nurse.  Relator became a Registered Nurse in 2006, holds a Master's degree in leadership and is currently working to become licensed as a Nurse Practitioner.  Relator has worked in the hospice industry for approximately fourteen (14) years, the last five (5) of which have been in a managerial role.

27.     Relator became employed by Elara on or around June of 2019 as a Regional Clinical Director.  As a Regional Clinical Director, Relator was responsible for overseeing day-to-day operations and compliance efforts for Elara's hospices.  During her employment, Relator oversaw two (2) offices for Elara, which were located at 1 Chisholm Trail, Suite 250D, Round Rock, Texas 78681, and 300 Landa Street, New Braunfels, Texas 78130.

### *Failure to Obtain Signed Election Statements and Notices of Patient's Rights*

28.     On or around December 2019, certain of Elara's offices, including the Round Rock and New Braunfels offices, underwent a rebranding effort, changing from the CIMA name to the Elara Caring name.  When this occurred, Elara replaced their internal patient forms so that they contained the Elara Caring name instead of the CIMA name.  This rebranding effort included the admission packet that all new Medicare patients were required to fill out for hospice care.  In the admission packet, Elara provided its statutorily-required election statement and notice of patient's rights.  These forms must be filled out and signed by the patient or the patient's responsible party in order for hospice care providers to be reimbursed by Medicare under the patient's Medicare benefits.

---

[4] *See id.*

29.     On or around February 6, 2020, while reviewing patient files in her normal course of work, Relator discovered that an election statement for one of Elara's newly admitted Medicare patients out of its Round Rock office was missing from the patient's file. This patient lacked the ability to provide consent for hospice treatment. Because of this, Elara was required to contact the patient's responsible party and have them sign the forms contained in the patient's admission packet on their behalf in order to admit the patient. Because the patient's responsible party was located in the San Antonio area, Elara sent an employee from its New Braunfels office to have the forms signed. These forms were returned to Elara's Austin office, where Relator discovered that there was no signed election statement.

30.     Upon discovering this, Relator immediately contacted Elara's Clinical Manager for its New Braunfels office, and the Clinical Manager confirmed that they had not obtained a signed election statement from this patient. Relator then began an audit of all new patient files for the New Braunfels office from December 2, 2019 (the approximate time of Elara's rebranding efforts) through the present. Upon her review, Relator discovered that approximately twenty (20) patients had not signed an election statement during this time. Two (2) of these patients' records did not have any of the forms contained in the admission packet at all, including the notice of patient's rights. These patients had been admitted as early as December 4, 2019, and Elara had been submitting claims to Medicare for reimbursement since their dates of admission.

31.     On the day of this discovery, Relator reported via email and phone to her Regional Administrator, Sarah Hopper ("Hopper"), her direct report, that Elara had been improperly billing Medicare for over two (2) months for services provided to these patients because Elara had not properly obtained a signed election statement and/or a notice of patient's

rights from these patients.  Hopper thanked Relator for bringing this issue to her attention. Hopper stated that she would have the hospice chaplain and a social worker visit the patients, have the patient or the patient's responsible party sign the missing documents, *and then backdate the documents to the time the patients initially enrolled in Elara's care*.  Relator informed Hopper that this was improper and that Elara would need to report the improper payments they received to Medicare.  Relator also pointed out that some of these patients had passed away before signing an election statement.  However, Hopper ignored Relator's recommendation to report the improper payments and stated that they would "get it all situated."

32.    Upon information and belief, Elara did not report its receipt of improper payments to Medicare.  If Elara backdated election statements and added them to patient files at a later date, it will be evident in Defendants' document management system.  Elara utilizes an electronic record management program called "Homecare Homebase" that houses and maintains all of Elara's patient charts.  Whenever a user enters information on a patient chart, the program tracks the date and time those changes were made to the patient chart as well as which user made the changes.  Thus, an individual with access to the program would be able to tell when a patient was first entered into the system and when any later documents were added, such as an election statement.

33.    On February 10, 2020, Relator had an in-person team meeting with Hopper, the hospice chaplain, a nurse, and an administrative employee, where Relator again expressed her concerns regarding the missing patient election statements and notices of patient rights. However, Hopper again dismissed these concerns stating that Elara's compliance team had indicated that there was no issue as long as Elara had later received the additional documents contained in the admission packet.  Immediately after this meeting, Hopper and an employee

from Elara's human resources department pulled Relator aside for another meeting and informed Relator that her job "no longer existed" and that Relator was being terminated effective immediately.

### *Admitting Patients Who Did Not Satisfy Admission Criteria for Hospice Care*

34.     Elara's New Braunfels office also engaged in a pattern of admitting and failing to discharge patients who did not satisfy the admission criteria for hospice care.  Hospice care is intended for terminally ill patients.  To be admitted for hospice care, patients must have a life expectancy of six (6) months.  Patients who show signs of improvement or whose conditions stabilize are not suitable hospice care under Medicare's guidelines and must be discharged.

35.     During Relator's employment, Elara's New Braunfels office had a number of Medicare patients that had been receiving hospice care for an inordinate amount of time.  Upon reviewing the medical charts for these patients, Relator discovered that many patients had very long lengths of stay.  Specifically, Elara had one patient who had been receiving hospice treatment *for multiple years*.

36.     Relator also discovered that the underlying documentation did not support patients' terminal diagnoses; Elara largely failed to utilize a palliative performance scale when evaluating their patients and failed to document the weight and other measurements of their patients.  These patients' charts evidenced neither a decline in health nor a change in condition, demonstrating that they were not suitable for hospice care.

37.     For example, Elara had a patient who had been receiving hospice treatment at home for well over six (6) months.  While the patient would not talk and needed assistance with eating and other tasks, the patient was in a stable condition.  The patient's spouse provided primary care, and Elara would generally only receive calls for menial tasks, such as changing the

patient's clothing.  This patient was ultimately transferred to a nursing home where they continued to receive hospice treatment.  Within two (2) weeks of the transfer, the patient's condition improved dramatically; the patient began speaking and self-feeding.  Despite this drastic improvement in condition, Elara refused to discharge the patient, and the patient continued to receive hospice treatment from Elara throughout Relator's employment.

38.     Hopper had ultimate authority for determining whether patients were admitted to the hospice program and when patients were discharged, despite not having medical licensure or proper qualifications.  Hopper had a reputation for keeping Elara's patients in hospice care, even though they showed signs of improvement or stabilizing.  Several nurses often complained to Hopper that patients in the New Braunfels office did not satisfy the criteria for hospice care.

39.     In or around December 2019, Elara announced the results of an internal audit, which revealed that approximately twelve (12) to sixteen (16) Medicare patients in the New Braunfels office did not satisfy Medicare's criteria for admission into the hospice program. These patients were subsequently discharged.  Upon information and belief, Elara made no report to Medicare that it had improperly received reimbursement for hospice services for patients that did not satisfy Medicare's admission criteria.  Upon information and belief, Hopper suffered no admonishment for improperly admitting and failing to discharge these patients.

40.     Elara's "Homecare Homebase" record management program maintains a log of all "live discharges" for Elara's hospice offices. The identities of the patients discharged as a result of the audit, as well as their patient records, can be gleaned from identifying Elara's "live discharges" listed in the program after the findings of the audit were announced.

## COUNTS AGAINST DEFENDANTS

### COUNT I

**False Claims Act, 31 U.S.C. § 3729(a)(1)(A) - Presentation of False Claims to Medicare**

41.     Relator incorporates by reference all paragraphs of this Complaint set out above as if fully set forth herein.

42.     Defendants knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to the United States Government, including those claims for reimbursement for hospice treatment without having a signed patient election statement and/or notice of patient's rights and for hospice treatment provided to Medicare beneficiaries who did not satisfy the admission criteria for hospice care.

43.     Said claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether they were false.

44.     By virtue of the false or fraudulent claims made by Defendants, the United States has suffered damages and therefore is entitled to recovery as provided by the False Claims Act of an amount to be determined at trial, plus a civil penalty of $5,500.00 to $11,000.00, as adjusted for inflation for each violation.

### COUNT II

**False Claims Act, 31 U.S.C. § 3729 (a)(1)(B) - Use of False Statements**

45.     Plaintiff incorporates by reference all paragraphs of this Complaint set out above as if fully set forth herein.

46.     Defendants made, used, or caused to be made or used, false records or statements to get a false or fraudulent claim paid or approved by the United States Government. Said false

records or statements were made with actual knowledge of their falsity or with reckless disregard or deliberate ignorance of whether or not they were false.

47.     By virtue of the false or fraudulent claims made by Defendants, the United States has suffered damages and therefore is entitled to recovery as provided by the False Claims Act of an amount to be determined at trial, plus a civil penalty of $5,500.00 to $11,000.00, as adjusted for inflation for each violation.

## COUNT III

### False Claims Act, 31 U.S.C. § 3729(a)(1)(G) - Concealment to Avoid Obligation to Pay

48.     Relator incorporates by reference all paragraphs of this Complaint set out above as if fully set forth herein.

49.     Defendants, by virtue of the acts and omissions described above, knowingly made, used, and/or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government, and/or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government pursuant to 31 U.S.C. § 3729(a)(1)(G).

50.     As a result of Defendants' actions set forth above, the United States of America has been and may continue to be severely damaged.

51.     The acts and omissions described above caused damages to the United States in substantial amounts to be determined at trial.

### PRAYER FOR RELIEF

52.     WHEREFORE, Relator prays that judgment be entered against Defendants, ordering that:

      a.  The Defendants cease and desist from violating the Federal False Claims Act;

b.  The Defendants pay not less than $5,500.00 and not more than $11,000.00, as adjusted for inflation, for each violation of 31 U.S.C. § 3729 et seq., plus three times the amount of damages the United States has sustained because of Defendants' misconduct;

c.  Relator be awarded the maximum Relator's share allowed pursuant to 31 U.S.C. § 3730(d);

d.  Relator be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d).

e.  Defendants be enjoined from concealing, removing, encumbering or disposing of assets which may be required to pay the damages, penalties, fines, and costs awarded by the Court;

f.  The United States and Relator should be awarded such other relief as the Court deems just and proper.

[Intentionally Left Blank]

## JURY TRIAL

53.     Pursuant to Rule 38 of the Fed. R. Civ. P., Relator demands a trial by jury.

Respectfully submitted,

/s/ Steve Sumner
Steve Sumner
Texas Bar No. 19508500
Email: ssumner@sumnerschick.com
Justin Sumner
Texas Bar No. 24063022
Email: jsumner@sumnerschick.com

Sumner Schick LLP
3811 Turtle Creek Blvd.
Suite 600
Dallas, Texas 75219
(214) 965-9229

ATTORNEYS FOR RELATOR

---